# EXHIBIT A

# Roy A. Hunt Deposition Excerpts

ROY HUNT, JR.  
ADDERLEY vs THREE ANGELS BROADCASTING

January 25, 2019  
1–4

**Page 1**

```
        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF FLORIDA

DAVID LAWRENCE ADDERLEY,    )
an individual,              )
                            )
        Plaintiff,          )
                            )  Case No.
    vs.                     )  18-23362-CIV-SCOLA
                            )
THREE ANGELS BROADCASTING   )
NETWORK, INC., a            )
non-for-profit Illinois     )
corporation, ROY HUNT,      )
JR., an individual, and     )
JAMES W. GILLEY, an         )
individual,                 )
                            )
        Defendants.         )
```

              DEPOSITION OF ROY HUNT, JR.

The deposition of ROY HUNT, JR., taken before Karen Waugh, CSR, RPR, at the Country Inn & Suites, Marion, Illinois, on the 25th of January, 2019, commencing at 9:02 a.m.

APPEARANCES:

For Plaintiff:  SAAVEDRA GOODWIN
                312 SE 17th Street, 2nd Floor
                Fort Lauderdale, FL 33316
                By Ms. Diane J. Zelmer
                By Ms. Caitlin Bronstein

For Defendants: MEAGHER & GEER, P.L.L.P.
                33 South Sixth Street, Suite 4400
                Minneapolis, MN 55402
                By Mr. Timothy R. Schupp
                By Mr. M. Gregory Simpson

Videographer:   Patrick Hoctor

Also present:   Earlenne Hunt

**Page 2**

                              INDEX

Examination by Ms. Zelmer:            Page   4

Exhibit No. 23-H marked:              Page   7
Exhibit No. 24 marked:                Page  85
Exhibit No. 25 marked:                Page 130
Exhibit No. 26 marked:                Page 135
Exhibit No. 27 marked:                Page 135
Exhibit No. 28 marked:                Page 143
Exhibit No. 29 marked:                Page 143
Exhibit No. 30 marked:                Page 143
Exhibit No. 31 marked:                Page 164
Exhibit No. 32 marked:                Page 181
Exhibit No. 33 marked:                Page 213
Exhibit No. 34 marked:                Page 222
Exhibit No. 35 marked:                Page 234
Exhibit No. 36 marked:                Page 239
Exhibit No. 37 marked:                Page 240
Exhibit No. 38 marked:                Page 241

(Exhibits attached to transcript.)

**Page 3**

                         STIPULATIONS

    IT IS STIPULATED AND AGREED by and between counsel for Plaintiff and counsel for Defendants that the deposition of ROY HUNT, JR., may be taken pursuant to Federal Rules by and on behalf of the Plaintiff, on January 25, 2019, at the Country Inn & Suites, Marion, Illinois, before Karen Waugh, a Notary Public; that the issuance of notice is waived, and that this deposition may be taken with the same force and effect as if all Federal Rules had been complied with.

    IT IS FURTHER STIPULATED AND AGREED that any and all objections to all or any part of this deposition are hereby reserved and may be raised on the trial of this cause; and that the said witness shall read and sign the deposition before filing.

**Page 4**

1    THE VIDEOGRAPHER: We are on the video
2 record. The time is approximately 9:03. Counsel have
3 complied with all state and federal rules. If you could,
4 please state your appearances for the record, beginning
5 with the plaintiff's attorney.
6    MS. ZELMER: Diane Zelmer and Caitlin
7 Bronstein for David Lawrence Adderley.
8    MR. SCHUPP: Timothy Schupp and Greg Simpson
9 for 3ABN, Roy Hunt and James Gilley.
10    THE VIDEOGRAPHER: Thank you, Counsel. You
11 may swear in the witness at this time and we'll begin.
12    ROY HUNT, JR., produced, sworn and examined on
13 behalf of the Plaintiff, testified and deposed as
14 follows:
15                    EXAMINATION
16 BY MS. ZELMER:
17    Q.  Good morning. Can you please state your
18 name?
19    A.  Roy Hunt.
20    Q.  Mr. Hunt, can you tell me what you did to
21 prepare for your deposition here today?
22    A.  I reviewed records, met with our attorneys,
23 and we looked at e-mails, financial reports, and talked
24 with different people at 3ABN. Do you need to know those
25 names?



800.211.DEPO (3376)  
EsquireSolutions.com

Page 9

1  Q.  -- that the record is clear on that?
2  A.  I can do that.
3  Q.  Okay. Have you ever been deposed before?
4  A.  Never.
5  Q.  So I'm going to give you a little -- a few
6  ground rules. Maybe your attorney's already gone over
7  them with you, but we're recording everything video and
8  our court reporter is taking down everything orally, so
9  we -- if you -- we can try not to talk over each other,
10 so if you can just wait for me to finish my question,
11 wait for Counsel to finish their objection, because they
12 may object. Typically it's for the purposes of the
13 record only unless your counsel tells you and instructs
14 you not to answer, then you won't answer, okay?
15 A.  Okay.
16 Q.  And once he objects or -- you know, just
17 give him a little bit of time, then you can go ahead and
18 answer, and I'll wait for you to answer before asking the
19 next question.
20 A.  Okay.
21 Q.  It's really easy to fall into a
22 conversation. I give these instructions and we still end
23 up talking over each other, so just be aware of that
24 throughout the deposition. And if you need to take a
25 break, please let me know. We'd be happy to do so. If

Page 10

1  you can please speak audibly, the nods and stuff like
2  that, they might come out on video but they certainly
3  don't come down on the transcript, so if you're nodding
4  yes, go ahead and verbally say yes, okay?
5  A.  Yes.
6  Q.  If you don't understand a question, please
7  ask me to rephrase. I'd be happy to do so. If you do
8  answer a question, I'm going to assume that you
9  understood the question. Is that fair enough?
10 A.  Fair.
11 Q.  Okay. And if I ask a yes or no question, if
12 you could try to answer yes or no, and then I understand
13 that you might have an explanation behind that, but just
14 try to answer the question yes or no, and try to listen
15 to the question, because a lot of people will not answer
16 the question that's specifically asked, and it goes a lot
17 faster if you just answer the question that's asked,
18 okay?
19 A.  I'll do my best.
20 Q.  All right. Great. I just want to get a
21 little background information about you. Could you tell
22 me your educational background, where you attended
23 college?
24 A.  Attended college two years, and it's
25 Southwestern -- they've gone through several name

Page 11

1  changes. At the time it would have been Southwestern
2  Union College in Texas.
3  Q.  What part of Texas?
4  A.  In the Dallas-Fort Worth area. It's
5  actually in Keene -- K-E-E-N-E -- Texas.
6  Q.  And when was that?
7  A.  Long time ago. That would have been --
8  Actually, the high school was part of the college, kind
9  of a unique situation, so I would have been there from
10 about '61 through about '69, I believe it was.
11 Q.  '61 to '69 that you were in Texas?
12 A.  Right, at that school. Part of it was high
13 school and part of it was college.
14 Q.  Okay. I understand. And --
15 A.  It's not like that anymore, but at that time
16 it was together.
17 Q.  Okay. All right. So did you obtain an
18 associate's degree or any other type of degree?
19 A.  No.
20 Q.  No?
21      MR. SCHUPP:  Make sure you let her finish
22 asking her question.
23 Q.  It already starts.
24      MR. SCHUPP:  It's early -- It's early on.
25 Q.  Yeah.

Page 12

1  A.  Okay.
2      MR. SCHUPP:  So let her finish, take a
3  breath, and then you can answer.
4  Q.  It's a little difficult because you got to
5  kind of hold back, but --
6      MR. SCHUPP:  You correctly anticipated.
7  Q.  Yes.
8      MR. SCHUPP:  That's the way we converse
9  normally. This is not a normal conversation.
10 Q.  Okay. What studies -- or what did you
11 study?
12 A.  Business.
13 Q.  Business?
14 A.  Business.
15 Q.  Just general business?
16 A.  Yes.
17 Q.  And do you have any other education past the
18 Southwestern Union?
19 A.  Courses here and there. We did do a
20 certification for trust, a trust officer, went to
21 La Sierra University in California and did the
22 certification, and that would have been 2010, first part
23 of the '11, I believe.
24 Q.  And are you certified as a trust officer
25 today too?



Page 13

1   A.  Yes.
2   Q.  Okay. So it's been continuous since 2010?
3   A.  Right.
4   Q.  Is that certification good for all states or
5  is it just California?
6   A.  It would be good for all states.
7   Q.  And can you tell me how long that course
8  was?
9   A.  It was a semester course jammed into
10 30 days. I remember that very well.
11  Q.  So you traveled out there and stayed there
12 for 30 days for that course?
13  A.  Yes.
14  Q.  And can you tell me what they taught? Did
15 they tell -- Did they teach about trust officer
16 responsibilities? Did they teach about the mechanics of
17 the trust or --
18  A.  It was pretty broad. It wasn't focused on
19 any one thing. It was trust officers that -- documents
20 that we would be involved with. We're non-profit, so
21 this was designed for non-profits, and everybody that
22 attended is in a ministry similar to ours, and so it was
23 pretty broad.
24  Q.  Did they -- Do you recall if they went over
25 any charitable trusts --

Page 14

1   A.  Yes.
2   Q.  -- at that seminar? Okay. And can you tell
3  me briefly what they may have taught you?
4   A.  They have taught me -- It was an overview of
5  what the documents were, how they work, what's needed to
6  begin, end. That's it. You know, it's -- it wasn't
7  focused on CRUTs. It was -- It was part of it. So we
8  spent time with attorneys that were there talking about
9  it and then we'd move on to annuities and other
10 documents.
11  Q.  And how much time would you say that this
12 course spent on the charitable trusts?
13  A.  I would say a day.
14  Q.  And since 2010, obtaining this certification
15 as a trust officer, have you taken any other courses or
16 any CLEs or --
17  A.  No.
18  Q.  Any other education that you've obtained
19 relating to any trusts, estates or charitable trusts?
20  A.  What we do is we go to -- every other year
21 we go to a seminar that's held for all of the -- my
22 counterparts across the country.
23  Q.  And what seminar is that?
24  A.  It would be a planned giving/trust services
25 seminar.

Page 15

1   Q.  And where are those held?
2   A.  All over the country. The last one was in
3  Tucson.
4   Q.  And who gives that planned giving and trust
5  services seminar?
6   A.  That's done by the general conference of
7  Seventh-day Adventists planned giving department.
8   Q.  And the last one in Tucson, when was that?
9   A.  That would have been the summer of -- wasn't
10 last year, so 2017.
11  Q.  Last year, 2018, or --
12  A.  '17.
13  Q.  2017?
14  A.  Yeah. I said we didn't do it last year,
15 so it was --
16  Q.  Oh, you didn't do it last year.
17  A.  Right.
18  Q.  I'm sorry. I misunderstood you. So you
19 would have done it 2017, 2015, 2013, 2011, roughly?
20  A.  Yes.
21  Q.  And your certification as a trust officer,
22 what do you understand that that qualifies you to do?
23  A.  That qualifies us to gather the information
24 from individuals. We tell them briefly how the document
25 works, and then we send information to a lawyer, who

Page 16

1  prepares a document, and they in turn talk with the
2  prospective client. They call and make sure they
3  understand the ins and outs. They really spend the time
4  with the individual on the phone, and it confirms what
5  I've told them and also more information about the CRUT
6  as far as the percentages, how that works and so forth.
7   Q.  So once you send it to the attorney, the
8  attorney takes over and explains the --
9   A.  Pretty much. I'm sorry.
10  Q.  -- explains the charitable or remainder
11 trust or any other type of instrument that they may be
12 drafting to the donor.
13  A.  Correct.
14  Q.  And you had mentioned client. Are you
15 referring to potential donors of 3ABN?
16  A.  Yes. We'll call them donors, clients.
17 Since we deal with annuities, we've got annuitants. Some
18 people are offended when we call them an annuitant, "What
19 is that," so they -- we find that client means more to
20 them than annuitants or trustee, trustor, that kind of
21 thing.
22  Q.  So, like, for David Lawrence Adderley, you
23 would call him a client?
24  A.  I would call him a client, yes.
25  Q.  Now, with regard to David Lawrence Adderley,



Page 17

1 the whole situation that you just talked about where you
2 gather the information and you tell them briefly about
3 the instrument, did that happen in this case?
4    A.  Yes.
5    Q.  Okay. So can we go through the timeline of
6 how that happened and how that occurred?
7    A.  Sure can. Let me get my notes. Since this
8 happened so long ago, I had to reconstruct through
9 documents and so forth.
10   Q.  And the notes that you have in front of you
11 are notes that you have prepared --
12   A.  I --
13   Q.  -- just to summarize, I guess, what that --
14 what occurred?
15   A.  Correct.
16   Q.  Okay.
17   A.  I sat down at the computer and --
18   Q.  Okay. At some point we'll want a copy of
19 those and we'll want to -- we'll want to mark them as
20 exhibits.
21   A.  That's fine.
22   Q.  I just want to make clear, those are not
23 notes that you made contemporaneously. Those are notes
24 that you prepared just recently, correct?
25   A.  Yes. They've been prepared the last two

Page 18

1 days.
2    Q.  Okay.
3    A.  The initial contact with David was that he
4 called me. Didn't know him from Adam. He called me on
5 July 20th of 2011 and he introduced himself. Do you want
6 to know about the conversation?
7    Q.  Yes, I do.
8    A.  Okay. He told me that he had been thinking
9 about this for a long time and that he was an unbeliever,
10 and I kind of let that go over my head, because an
11 unbeliever could be not a member of the church, not a
12 member of the Seventh Adventists Church. I just let it
13 go over and I let him talk a little bit, and he said --
14 he kind of gave a history. He said that when 3ABN first
15 started, first beginning, the roots, our president was
16 out talking about it and trying to get support from the
17 country to start a network.
18   Q.  Okay. And just to stop you there, the
19 president, who -- can you identify who that was?
20   A.  Danny Shelton.
21   Q.  All right.
22   A.  Evidently Danny spoke in David's church in
23 Florida, told him what the -- his mission was, what he
24 wanted to do. He heard the word, he had no money, but he
25 wanted to go ahead and start a television network, and

Page 19

1 David kind of closed his ears to it after that. He just
2 felt like this will never work, and --
3    Q.  Do you know when that was that Danny Shelton
4 visited his church?
5    A.  Thirty years -- well, at that time it would
6 have been about thirty years before David contacted me.
7 That would have been in the '80s. And as time went
8 along -- and I asked -- when he was telling me this, I
9 said, "David, you mentioned the word unbeliever to me,"
10 and I said, "Does that mean you're not a church member or
11 what?" When he said that Danny come to his church, I
12 figured Danny went to a Seventh Adventist Church. He
13 said, "Oh, I'm a Seventh-day Adventist." He says, "I
14 just didn't believe in 3ABN," and he says, "After all
15 these years, I" -- I mean, it was an apology call almost
16 for not doing something sooner, and then he told me about
17 some land that he had in the Bahamas, and he said, "It's
18 worth 30 million dollars."
19   Q.  He told you it was worth 30 million dollars?
20   A.  Yes, and when I heard 30 million, my heart
21 kind of sank and I thought, that -- any time I hear those
22 kind of numbers, I get suspicious as to what's behind the
23 30 million. A lot of people have all kinds of games they
24 play and they see something, an investment -- quote,
25 investment that they're going to make all this money, and

Page 20

1 they'll call us and say, "You know, when we get this
2 money, we want to do a CRUT or an annuity or whatever,"
3 and we've learned to say, "When that happens, give us a
4 call back." They never call back because the money
5 doesn't come. And I thought when David told me he had
6 30 million dollars, there's something wrong here. So
7 after the conversation -- and we talked about that
8 30 million, how he wanted to -- what he wanted to do with
9 it, and he already had it in his mind that he wanted to
10 do -- I don't know if he used the word CRUT, but he
11 wanted to do a document where he would get a payment out
12 of it.
13   Q.  And how did he know about a type of
14 instrument like that?
15   A.  I'm assuming that he heard one of our
16 promotions or saw some of our literature. We really
17 didn't go into that as to how he heard about it, but he
18 knew, and he knew he wanted to bypass his taxes. So that
19 conversation ended, and I said, "Do you mind if I have an
20 attorney call you," and he said, "No, I don't mind," so I
21 called Barry Benton and I said, "Barry, I have a phone
22 call that just came in," and I said, "I'm suspicious.
23 Would you be willing to call him and find out anything
24 about him, if he -- if this is for real, just what?" He
25 said, "Sure, I'll call him." So he called me back and he

Page 21

1  said, "I feel this is for real." They talked, and both
2  David and Barry had been in the service about the same
3  time, a year apart, and they knew a lot of the same
4  commanding officers, so they kind of hit it off real
5  quick.
6      Q.  Do you know what commanding officers they
7  were at all?
8      A.  I have no idea. It was just conversations
9  they had between them, and --
10     Q.  So do you know when this call happened
11 between Barry and Mr. Adderley?
12     A.  I believe it happened the same -- well, I
13 picked up the phone and called Barry and Barry called
14 David, so this would have happened the same day, and so
15 based on what Barry told me, I took the information to
16 our administration. I said, you know, "It looks like we
17 may have something here that would benefit 3ABN." I
18 said, "It's just happened, we don't know what -- what's
19 entailed, it sounds like" -- I also had to ask Barry, can
20 we do business in the Bahamas, since the property was
21 over there. That's a question I didn't know, and Barry
22 says, "Yes, you need an attorney in the Bahamas," and he
23 says, "I can work with whoever we find and make this
24 happen." So that was the beginning of David Adderley's
25 CRUT, and that happened on the 20th of July, 2011.

Page 22

1      Q.  Now, when he called you, I think you had
2  mentioned that he wanted a tax deferral and he also
3  wanted an income stream; is that correct?
4      A.  Right.
5      Q.  And that's why he reached out to you, to see
6  if 3ABN could do this type of instrument?
7      A.  Correct.
8      Q.  Okay. Can you go on to the next timeline,
9  next communication?
10     A.  Next communication, we had a conference to
11 go to as 3ABN, so we talked about it at the conference,
12 and I called Barry on the 26th of July.
13     Q.  Okay. So just --
14     A.  No, excuse me. I contacted David Adderley
15 by phone and said that Barry Benton would be calling him,
16 and that was the call where the attorney goes over all
17 the information of the CRUT.
18     Q.  Okay. And so --
19     A.  That was on the 26th.
20     Q.  I just want the record to be clear. The
21 conference that you talked about that 3ABN had, when did
22 that occur and who was there?
23     A.  Oh, this is a national conference. It
24 wasn't just for 3ABN. It would -- This was in
25 Sacramento, I believe. It's called ASI.

Page 23

1      Q.  So you were up in ASI --
2      A.  In Sacramento.
3      Q.  -- on July 26?
4      A.  I don't remember the exact dates of the
5  conference, but we huddled -- I think in my notes it says
6  we huddled about this CRUT and David Adderley --
7      Q.  And --
8      A.  -- because I needed -- before I could pursue
9  it, I needed permission from 3ABN to go forward with it.
10     Q.  Okay. Who did you specifically talk to at
11 3ABN?
12     A.  It would have been our president, Jimmy
13 Gilley; Brian Hamilton; and Molly Steenson. Jim was the
14 president at the time. I don't think Danny Shelton was
15 there. He -- But he would have been notified.
16     Q.  So Danny Shelton, he was the president, and
17 then he -- did he leave 3ABN?
18     A.  He didn't leave. He was -- He kind of
19 stepped back, and he was considered a consultant and
20 founder of 3ABN.
21     Q.  For what years?
22     A.  Well, we came in 2010. Jim Gilley had been
23 there probably three years, so from -- I don't know for
24 sure, but approximately 2007 to 2015 that Danny would
25 have been the founder and consultant. Jim retired in

Page 24

1  2015 and then Danny took over the presidency.
2      Q.  Okay. It's easier if I just ask these
3  questions in between. I don't mean to throw you off,
4  but --
5      A.  No, no problem.
6      Q.  -- you can go ahead and continue.
7      A.  Okay.
8      MR. SCHUPP: So what's the question?
9  Just -- Do you have a question in mind?
10     Q.  Just -- Yeah, if you can just tell me --
11 okay. I think the last communication that we were at was
12 the --
13     A.  26th.
14     Q.  -- July 26th, yes.
15     A.  Right.
16     Q.  So if you could just tell me what that
17 communication was with Mr. Adderley.
18     A.  I contacted Adderley by phone that Barry
19 Benton would be calling regarding the CRUT.
20     Q.  And how long was that conversation?
21     A.  I -- Oh, my conversations with David were
22 never very long. I'd probably say five minutes.
23     Q.  So even your first communication with him
24 back on July 20th --
25     A.  Oh, on July 20th, no, that probably lasted



Page 65

1  MR. SCHUPP: Yes.
2  A. Oh, okay. Not at the time that the CRUT was
3  being drafted. It was while we were reading the CRUT on
4  the 21st.
5  Q. (By Ms. Zelmer) Okay. So that was my
6  question. On August 21st, 2011, you specifically told
7  Mr. Adderley that he should go get his own attorney.
8  A. Correct. Nothing in writing.
9  Q. And what did he say?
10  A. He said -- His answer was, "No, I trust
11  3ABN."
12  Q. Why didn't you give him more time since you
13  were telling him that he should get his own attorney --
14  and you previously testified that the other information
15  in the proposal should be reviewed by an accountant,
16  correct?
17  A. Yes.
18  Q. So why didn't you give Mr. Adderley the time
19  to go retain his own attorney and his accountant to
20  review this information before executing -- before having
21  him executed the -- execute the charitable remainder
22  unitrust?
23  A. He didn't indicate that he wanted to use
24  anyone else, and there's no -- if he would have said
25  that, there would have been no problem. We don't put

Page 66

1  pressure on people. If he would have said, "Give me a
2  couple days to talk to my finance person," we would have
3  said, "Fine." There was no indication from him that he
4  wanted to do it.
5  Q. But you knew enough that you told him that
6  he should seek independent counsel and that he should
7  seek the advice of an accountant, correct?
8  A. I did, and when he said, "No, I trust 3ABN,"
9  we went forward on that.
10  Q. Without disclosing the conflict of
11  interest --
12  MR. SCHUPP: Object to the form --
13  Q. -- correct?
14  MR. SCHUPP: -- that there was any conflict.
15  You're assuming it.
16  Q. You can answer.
17  A. Repeat the question again.
18  Q. I said, you went forward after Mr. Adderley
19  told you he trusted 3ABN without disclosing to him the
20  conflict of interest that Mr. Benton and 3ABN had, with
21  the relationship that they had, correct?
22  MR. SCHUPP: Object to the form.
23  Q. Now you can speak.
24  A. Since I was not aware of conflict of
25  interest, I wouldn't have said it.

Page 67

1  MR. SCHUPP: Yeah, I'm going to shut that
2  off. Are you warm enough now?
3  THE WITNESS: Yeah.
4  Q. (By Ms. Zelmer) Do you remember where you
5  took him to dinner?
6  A. Took him to Denny's, I know that. I can't
7  remember if it was on that particular trip or not.
8  Q. Was it just that one time or was it just one
9  time that you took him out for dinner?
10  A. No. We took him out a couple of times, but
11  I couldn't tell you what -- when it was.
12  Q. So other than what we have discussed what
13  had been said and discussed at August 21st meeting, what
14  else happened in those two to three hours?
15  MR. SCHUPP: You've already asked him that,
16  but you can tell her again.
17  A. Yeah, I was going to say, it was basically
18  reading. It was reading the documents, and there
19  really -- you know, by the time we got through all that,
20  we were all tired. If I remember right, we flew in that
21  day. I could be mistaken. But usually by the end of the
22  day we're ready to go, so I don't recall any
23  conversations that we would have had.
24  Q. Okay. So I just want to make sure that
25  other than what we've discussed today, you don't remember

Page 68

1  any other discussions that happened on August 21st --
2  A. No.
3  Q. -- 2011, correct?
4  A. Again, that's eight years ago and I just
5  don't remember.
6  Q. So what happens? Do you tell him that we'll
7  be back tomorrow to execute it?
8  A. Right. I said, "We can go to the -- Do you
9  have a place that you'd like to go to notarize," and he
10  said yes. There was no hesitation on getting the
11  document signed.
12  Q. So -- Okay. And you fly out on the 22nd
13  too?
14  A. I don't know if it was the 22nd or the 23rd.
15  I think we flew from there to Orlando the next day.
16  Q. So what happened --
17  A. I was looking -- I was looking at records,
18  and it appeared that we were in Orlando on the 23rd.
19  Q. So let's go through what happened exactly on
20  August 22nd. How long were you there?
21  MR. SCHUPP: When you say there, where?
22  Q. How long were you at David Adderley's house
23  on August 22nd, 2011?
24  A. I don't think we were at his house at all
25  other than to pick him up to go and get the papers



Page 129

1 Q. Who's -- Who in administration?
2 A. Brian Hamilton and Jim Gilley when he was
3 there and Danny Shelton. I don't know if he was in the
4 meeting or not, but I've raised the issue.
5 Q. And what were you told?
6 A. No decisions were made, so let's just
7 continue as we go.
8 Q. Had you made a recommendation that we should
9 have an attorney who's licensed in the area in which
10 where the donor resides?
11 A. Yes, I have.
12 Q. Do you know when you had made that
13 recommendation?
14 A. I don't remember the date. I don't know.
15 It's been the last year.
16 Q. Okay. Oh, you had your notes. I wanted to
17 get a copy of that and mark it as an exhibit. Do you
18 have an extra copy for me or can -- or --
19 A. You can -- You can keep that.
20 Q. Are you sure? Because I can make a copy.
21 A. I've got another one.
22    MR. SCHUPP: There's something on the back
23 of there. Is that something you want?
24 A. Oh. I've got another one here.
25 Q. Okay.

Page 130

1 A. Just in case you did want it.
2    MS. ZELMER: Did you want to look at it real
3 quick?
4    MR. SCHUPP: No.
5    MS. ZELMER: Okay. We're going to mark this
6 as Exhibit 25.
7    MR. SCHUPP: I'll just look at it to make
8 sure it's the one I saw before. Okay. It's fine, Diane.
9    MS. ZELMER: Okay.
10    (Exhibit No. 25 marked for identification.)
11    MS. ZELMER: Thank you.
12 Q. (By Ms. Zelmer) Okay. So Exhibit 25 are
13 the notes that you've prepared I guess over the last
14 week?
15 A. The last three days.
16 Q. Last three days?
17 A. Yeah.
18 Q. Okay. And this was just you going through
19 the documents, jogging your memory --
20 A. Right.
21 Q. -- making notes?
22 A. Trying to get a timeline, because if you
23 would ask me that -- these questions without this, I
24 wouldn't be able to tell you. It's been -- It's just
25 been too long ago.

Page 131

1 Q. Okay. So we were last on November 14th,
2 2011, and you had indicated that you flew out to see
3 Mr. Adderley on that date?
4 A. On the 14th?
5 Q. Correct.
6 A. We don't know.
7 Q. You don't know.
8 A. We don't know why we were there. We didn't
9 fly down just for the trust --
10 Q. Right.
11 A. -- for the revocable trust. There had to
12 have been another reason, but I don't know what that is.
13 Q. Did you have communications between
14 August 22nd, 2011, and November 14th, 2011, with
15 Mr. Adderley?
16 A. From what dates?
17 Q. Since the time that the charitable remainder
18 unitrust was signed on August 22nd, 2011, until
19 November 14th, 2011.
20 A. There could have been some incidental
21 telephone calls. Timing I don't know. There wasn't
22 anything major. It would have been just a -- maybe a
23 call to David to say what's happening with a document or
24 something like that, but nothing major.
25 Q. So --

Page 132

1 A. And I don't even know if that happened, but
2 that could have happened.
3 Q. So what were your next steps? You have a
4 signed charitable remainder unitrust from David. What
5 happens next?
6 A. Okay. On the 24th, January 24th, 2012,
7 Earlenne and I took David -- we flew down, took David to
8 the Bahamian Consulate to resign as the trustee.
9 Q. And during this time, or in between the
10 period after you signed the charitable remainder unitrust
11 and the time that you fly down to have David sign the
12 resignation of trustee, did you contact anyone in the
13 Bahamas to -- regarding David's property, regarding the
14 Indentures of conveyance, regarding appraisal, regarding
15 the survey, anything?
16 A. It's -- Let's see. We dealt with the
17 attorney, Denise Lewis-Johnson, in Nassau. I don't know
18 when we started with her. Let's see. It had to have
19 been sometime between the signing of the CRUT and May 8th
20 that we talked to Denise, so we probably talked to her
21 two or three times about the property and about the
22 process of doing the conveyances.
23 Q. And when you say we talked, it was you and
24 who?
25 A. It would be me. I don't believe there was



Page 133

1 anybody else. I say we a lot, so, yeah, it would have
2 been me --
3    Q.   You're talking about 3ABN, essentially?
4    A.   Right, right.
5    Q.   Yeah.
6    A.   Yeah.
7    Q.   So you -- during this process, I mean, you
8 knew you had to transfer the property in the charitable
9 remainder unitrust, correct?
10   A.   Correct.
11   Q.   So as part of that, you contacted Denise
12 Lewis-Johnson in the Bahamas?
13   A.   In the Bahamas.
14   Q.   And what was her role?
15   A.   She was our Bahamian attorney that had to do
16 the conveyances. She helped us through with whatever
17 document we may have to get through the government
18 process. She's very well known in the government and
19 very well respected, so we used her for that purpose.
20   Q.   Did she obtain the permit?
21   A.   Which permit?
22   Q.   The permit for the property.
23   A.   Yes. That was all part of the conveyance,
24 that whole document.
25   Q.   Do you know, did Miss Lewis-Johnson ask you

Page 134

1 to provide any information so that they could submit it
2 to the Bahamas government so that they could get the
3 permit?
4    A.   She had to get the information from
5 somewhere, and it would have been me, through e-mails and
6 back and forth that way. Those e-mails should be in the
7 discovery. So she would have asked. She had to get the
8 information.
9    Q.   Was your communication mainly by e-mail
10 with --
11   A.   E-mail.
12   Q.   -- Miss Lewis-Johnson? Yes?
13   A.   Yes.
14   Q.   Okay.
15       MR. SCHUPP: I refrained from saying
16 anything that time.
17       MS. ZELMER: All you have to do is, like, do
18 this now.
19   A.   Yeah. As quick as I do it, I realize I've
20 done it. Such a habit.
21   Q.   (By Ms. Zelmer) Normally there's, like, a
22 due diligence process to submit -- you know, where you
23 submit certain information to the government for -- to
24 obtain the permit. Do you know if that ever occurred?
25   A.   She took care of all of that. Whatever

Page 135

1 needed to be done, we gave it to her. She made it
2 happen.
3    Q.   Any documents you would have transmitted to
4 her, would that have been transmitted via e-mail?
5    A.   I believe everything was transmitted that
6 could be transmitted by e-mail. If it had to be an
7 original, it would have been FedExed.
8        MS. ZELMER: I'm going to mark as the next
9 two exhibits --
10       MR. SCHUPP: 26 and 27?
11       MS. ZELMER: -- 26 and 27.
12       MR. SCHUPP: Which is which?
13       MS. ZELMER: The -- Exhibit 26 is the notice
14 of resignation of trustee dated January 24, 2012, and 27
15 is acceptance of appointment of trustee. It's marked
16 January 26 -- or is dated January 26, 2012. Can you
17 please mark those?
18       (Exhibits Nos. 26 and 27 marked for
19       identification.)
20   A.   Is this for me to look at?
21   Q.   (By Ms. Zelmer) Yes, it is. So the court
22 reporter has marked as Exhibit 26 the notice of
23 resignation of trustee. Mr. Benton prepared this
24 document; is that correct?
25   A.   Correct.

Page 136

1    Q.   Did you tell him to prepare it?
2    A.   Yes.
3    Q.   Why?
4    A.   Why? Because it was time to flip the CRUT.
5 I mean, he did the CRUT, so it would be natural for him
6 to do this.
7    Q.   Why -- okay.
8    A.   Nobody would have knowledge of why we're
9 flipping the trust. Benton had that -- He did it.
10 That's who we asked to do the CRUT.
11   Q.   Why wasn't 3ABN named as just the trustee if
12 you had intended for 3ABN to be the trustee?
13   A.   Legal reasons, and I'm not sure I can tell
14 you what those reasons are. A flipped CRUT, when you're
15 doing the process of the new CRUT, coming up with the
16 paperwork, at a certain point -- and Adderley knew
17 this -- that it would flip over to 3ABN so we can go on
18 the land and do what we need to. If there's any
19 modifications, any cleanup, anything, we can do it
20 without any problems and he wouldn't have to be concerned
21 about it.
22   Q.   When did you -- When did you approach
23 Mr. Adderley about the notice of resignation of trustee?
24   A.   He knew that from the time the CRUT was
25 signed, that at some point it would flip.



Page 153
1   A.  Denise was the one that took care of all
2   this, and the way I understood it, that this is a -- I
3   don't want to get myself into trouble, because I only
4   know just enough to get me in trouble, but it's not a
5   payment, I know that. It's something that at the time
6   the land is sold is paid to the government, I believe,
7   but Denise would have to be the one to give the exact
8   rationale on that.
9       Q.  Okay.
10      A.  I don't want to --
11      Q.  But your understanding is that $50,000 gets
12  paid to the government when the property --
13      A.  Right.
14      Q.  -- gets sold.
15      A.  It's not paid to David.
16      Q.  And when you read these documents to David,
17  did you make that clear?
18      A.  I don't think, from what I remember, that we
19  even talked about the 50,000, not until he called me
20  later, a couple years later, when somebody told him that
21  he should have been paid. I don't know who that person
22  was, but I told him again, I said, "David, you remember
23  you don't get paid until the land sells, and this is not
24  a payment. This isn't what you're going to get on the
25  land sales. It's what the proposal said that you get

Page 154
1   paid. That's what you get paid."
2       Q.  That --
3       A.  He was all right with that.
4       Q.  That was -- That was communicated to him,
5   though, after the signing of the indentures of
6   conveyance, correct?
7       A.  Right, and -- yes.
8       Q.  So, I mean, I just want to be clear what you
9   had when you went to the consulate. You certainly didn't
10  have the recording page cover sheets, correct?
11      A.  No. We had the conveyance.
12      Q.  Did you have the instrument data form?
13      A.  From what I remember, it's from this page
14  on.
15      Q.  Okay. And that is P-000160?
16      A.  This particular one is 133.
17      Q.  Okay. Right. We can identify them for each
18  one, each exhibit.
19      A.  We're looking at 28. Let me -- Let me go to
20  that. Number ending 160.
21      Q.  Okay. And so this page you would have read
22  to Mr. Adderley, correct?
23      A.  This page. I would have started here with
24  the land, the 25 acres in this case, that description,
25  and going forward.

Page 155
1       Q.  Going backward or going forward?
2       A.  Is that backward or forward? This
3   direction.
4       Q.  Okay. I understand. So --
5       A.  Yeah.
6       Q.  -- I just want to make the record clear.
7   From P-00162 to P-00169 you would have read to David
8   Adderley --
9       A.  Correct.
10      Q.  -- prior to executing the indentures.
11      A.  Not at the consulate, but at his home. Once
12  we got to the consulate, just before he signed, I said,
13  "David, this is the conveyance that represents 25 acres,
14  this is the conveyance," whatever the acreage was, so he
15  knew the acreage that he was signing.
16      Q.  And so for Exhibit No. 28, it was 25 acres?
17      A.  Yes.
18      Q.  Okay. And this is dated August 31st, 2012,
19  by David R. Davis. Did you have a signed version of this
20  at the time of executing or taking Mr. Adderley to the
21  consulate to execute?
22      A.  Did I have this signature?
23      Q.  Uh-huh.
24      A.  I don't remember.
25      Q.  And then the next three pages we talked

Page 156
1   about. That was the actual indenture of conveyance. You
2   read that --
3       A.  Right.
4       Q.  -- word for word, right, to him?
5       A.  Right.
6       Q.  And then the P-00166, you would have read
7   that to Mr. Adderley?
8       A.  Yes.
9       Q.  And then I guess the next pages are just
10  attachments that are just --
11      A.  Yes.
12      Q.  -- attachments of his pass --
13      A.  Passport and the property.
14      Q.  And how did you get his passport?
15      A.  We had to reapply for it before we could do
16  anything. He couldn't find it. Well, no, it was
17  outdated and we had to start all over again.
18      Q.  So you helped him reapply?
19      A.  Right.
20      Q.  And did you have to get certain documents
21  from him and submit them or --
22      A.  He didn't have the death certificate for his
23  dad, and we had to show where he came from, who his dad
24  was, so we had to get that information. They had a list
25  of information we had to get to prove who he was and



Case 1:18-cv-23362-RNS   Document 163-1   Entered on FLSD Docket 11/18/2019   Page 11 of 14

Page 173

1 seen it, heard a discussion. That's just not the type of
2 organization we are.
3    Q.  Okay.  Once the indentures of conveyance are
4 signed, then 3ABN has the property in the trust, correct?
5    A.  Correct.
6    Q.  And Gilley's operating as the trustee.
7    A.  Correct.
8    Q.  And do you know what date you believe that
9 to be, that the property was transferred?  To the best of
10 your knowledge.  I'm sure that your attorneys will clear
11 up the -- clear it up, but --
12    A.  Yeah, I don't know at this point.  I really
13 don't.
14    Q.  Do you -- Do you know if it was at least by
15 the end of 2012?
16    A.  Oh, yes.
17    Q.  The indentures --
18    A.  Yes.
19    Q.  -- of conveyance were recorded on
20 September 12th, 2012, so would have it been sometime
21 before 2012 -- or September 12th, 2012?
22    A.  Yes.
23    Q.  Okay.  We can say that for sure.
24    A.  Yes.
25    Q.  So you said that the decision was made to

Page 174

1 open list it.
2    A.  Correct.
3    Q.  And that decision was made by Jim Gilley?
4    A.  And the administrative committee.
5    Q.  And does 3ABN have a lot of experience with
6 open listing?
7    A.  No.
8    Q.  Have they ever open listed a property
9 before?
10    A.  Not to my knowledge.
11    Q.  This was the first one?
12    A.  I've never heard of an open listing until
13 this came up, and I asked the question, "Open listing,
14 what's that?"
15    Q.  Did you agree with that decision?
16    A.  It -- I like the theory that if we can save
17 money for the trust, that made sense.
18    Q.  But what if you can't sell the property
19 because it's open listed?
20    A.  Then we -- I mean, that's what happened, and
21 that's when we got Adriana --
22    Q.  Okay.
23    A.  -- involved.
24    Q.  So for how long was it open listed?
25    A.  I would -- I would say two -- approximately

Page 175

1 two years, because we had a open listing on the Bahamas
2 island and then myself.
3    Q.  So, I mean, when you say open listed, how
4 did you list it?
5    A.  For us, we listed it online.
6    Q.  Was there a specific web site or something?
7    A.  There was a number of -- there's LandWatch,
8 Escape Artist, were two of the main ones, and we listed
9 it under international property and had the sales video
10 on the link.  You know, somebody could click the button
11 and see the sales video and some pictures.
12    Q.  And how long did you have it listed on
13 LandWatch?
14    A.  I don't know.  I think we had all of them up
15 probably a year, year and a half.
16    Q.  Did those listings go up immediately after
17 the indentures of conveyance were recorded in
18 September 12th, 2012?
19    A.  Fairly soon after.  I don't know exactly how
20 soon.
21    Q.  So from September 12th, 2012, to roughly
22 early 2014?
23    A.  That sounds about right.
24    Q.  Okay.  And did you get any offers at all?
25    A.  No offers.  Just a lot of people that

Page 176

1 couldn't speak English and people that wanted to do joint
2 ventures, and we were not interested in joint ventures,
3 and no --
4    Q.  Any serious prospects at all?
5    A.  No serious.  The gentleman on the island, he
6 kept telling me he had somebody, but they never
7 materialized.
8    Q.  Who's the gentleman on the island?
9    A.  James Fox.  He worked for one of the
10 realtors.  I'm not sure which one it was at this point.
11    Q.  So even though it was open listed, James Fox
12 was going to provide you with a buyer?
13    A.  Yes, because, I mean, he would get a
14 commission out of it.  We wouldn't.  You know, if we sold
15 it on our own, we would not get a commission.
16    Q.  So if you're going to give someone a
17 commission, why wouldn't you just list it?
18    A.  The rationale was if you give it to one
19 person in the area, only they can participate.  I don't
20 think they had multiple listings on the island.  James
21 Fox could do whatever he wanted to in trying to promote,
22 and we gave him the sales video with his picture at the
23 end and we never saw that go up online, and we finally
24 realized that we -- hey, we've got to do something that's
25 going to mean selling the land.



Page 217

1   A. Correct.
2   Q. And it also included instructions and the --
3   I guess it's the -- what you call the proposal, but it's
4   listed here as the charitable unitrust computation?
5   A. Yes.
6   Q. Okay. And after that, then did you have any
7   communication with Mr. Ladd?
8   A. No, until one time when he -- did he call me
9   or an e-mail? There's an e-mail that says that he
10  thought with -- what's the word -- ameliorated.
11  Q. Right.
12  A. And it was basically a green light that
13  everything was taken care of.
14  Q. Okay. So --
15  A. And that's -- there wasn't a big
16  discussion --
17  Q. Did you --
18  A. -- other than --
19  Q. Okay. Go ahead.
20  A. -- other than what he says here, "You'll
21  receive" -- he put "900,000 per year until you pass.
22  They indicated the unitrust allows them to exercise total
23  control of the property but wants to honor your wishes to
24  use Adriana as if -- as if that is your choice," and
25  that's true. We wanted to make sure he felt positive.

Page 218

1   He was telling us he wanted to use Adriana and we
2   didn't -- we didn't kick about it.
3   Q. Did you make the representation to Matthew
4   Ladd that he would receive $900,000 per year?
5   A. I didn't give him a firm figure as -- you
6   know, what I was looking for here was 950, but nothing
7   concrete. I said somewhere in the neighborhood of
8   950,000.
9   Q. Then sitting here today, after looking at
10  this April 26, 2016, e-mail, do you remember where you
11  got that number?
12  A. I don't. I'm going to have to go back
13  and -- I'm batting myself on the head trying to figure
14  out where I'm coming up with that.
15  Q. But sitting here today, you don't know that
16  it's written down anywhere?
17  A. I want to say it is, but --
18  Q. Okay.
19  A. -- I don't know.
20  Q. Well, if it is and you find it, could you
21  please give it to your attorneys?
22  A. I will.
23  Q. Okay.
24  A. Definitely.
25  Q. Did you give Mr. Ladd any representation as

Page 219

1   to how long you thought it would take to sell the
2   property?
3   A. No.
4   Q. Did you ever give Mr. Adderley any
5   representation how long you thought it would sell the --
6   it would take to sell the property?
7   A. No.
8   Q. Sitting here today, do you know how long it
9   would take to sell the property?
10  A. If we could get away from this table and we
11  can go to work on it, maybe, you know, six months. Don't
12  know. Don't quote me on that, but --
13      MR. SCHUPP: Well, it's written down under
14  oath on video.
15  Q. It's a little hard not to quote you on it.
16  Okay. Other than the one contact that Danny Shelton had
17  told you about with this other realtor, I guess you had a
18  potential buyer, have there ever been any other potential
19  buyers that 3ABN was aware of?
20  A. Danny along with that told us about Wintley
21  Phipps. He's a singer, a black singer that's got a deep,
22  powerful voice, and he and Danny were talking about that
23  property, and he threw Oprah Winfrey's name into the pie.
24  I don't know where that stands. That's just over --
25  basically overhearing the conversation, but that's the

Page 220

1   only thing I'm aware of.
2   Q. And when was that?
3   A. Probably about the same timing -- this has
4   been -- this has been ongoing for a while.
5   Q. So longer than a year?
6   A. I don't think so. I think it's probably a
7   year or less.
8   Q. Did 3ABN ever put -- ever deliver to
9   Mr. Adderley annual accounting as to what the status of
10  the trust was?
11  A. Annual accounting. I don't know. That
12  would be out of my ballpark.
13  Q. That would be a Brian Hamilton question?
14  A. Brian, right.
15  Q. Okay. But you're not aware sitting here
16  today?
17  A. No, I'm not.
18  Q. Did you provide updates to Mr. Adderley
19  orally on, you know, some sort of frequent basis?
20  A. As far as what's going on with --
21  Q. The sale of the property.
22  A. Yeah, quick call. He's never one to stay on
23  the phone a long time; just give me information on what's
24  going on.
25  Q. How often?



Page 221

1  A.  I haven't talked to him since that call I
2  read.
3      Q.  Before that call, when --
4      A.  Before that, probably every couple months,
5  and sometimes he'd leave a voicemail.  I would call him
6  back because I was on the road, on a plane somewhere, and
7  I'd call him back, he says, "I don't know why I called
8  you."  He says, "I've forgotten," so, you know, he says,
9  "If I remember, I'll give you a call," so those are
10 intermittent type calls.
11     Q.  Do you know sitting here today what expenses
12 that 3ABN has spent on the property?
13     A.  We're looking at about -- around 200,000.
14 Could be a little less, a little more.
15     Q.  Can you break that down for me?
16     A.  10,400 on the path that they widened, and
17 the rest of it would be on the road that was put in, the
18 gravel road.
19     Q.  Spent $190,000 on the road?
20     A.  It's a long, long road.
21     Q.  Did they clear anything for the road or was
22 it just putting in the gravel?
23     A.  That I don't know.  I know they had to level
24 quite a bit, but I don't know everything there is to know
25 about that road.  It's the bits and pieces I pick up.

Page 222

1      Q.  Okay.  Has 3ABN spent additional money on
2  the survey, the appraisals?
3      A.  Oh, by all means.  I don't have those
4  figures, but I think we spent about $65,000 on the
5  survey.  On the appraisals, I can't remember on those.
6          MR. SCHUPP:  Diane, there were two
7  appraisals, we found out yesterday, and this first
8  appraisal is going to be in the supplemental production
9  we're doing, and you can ask him about that.
10         THE WITNESS:  Yeah.
11         MR. SCHUPP:  I saw it for the first time
12 yesterday.
13         MS. ZELMER:  Okay.  So I'm going to mark one
14 of the appraisals as an exhibit.  Here.
15         MR. SCHUPP:  This is the second one?
16         THE WITNESS:  Second one.
17         MS. ZELMER:  This is the second one.  I
18 think it's 34, right?
19         (Exhibit No. 34 marked for identification.)
20     Q.  (By Ms. Zelmer)  Okay.  Exhibit 34 is an
21 appraisal dated November 15th, 2012; is that correct?
22     A.  Yes.
23     Q.  And the very last two pages, is that the
24 retainer agreement?
25     A.  Yes.

Page 223

1      Q.  So does this refresh your recollection how
2  much that 3ABN paid for the second appraisal, I guess?
3      A.  $6500.  I would have said more than that,
4  so -- if this was 65, I want to say the other one was
5  around $10,000.
6      Q.  Okay.  So is this the appraisal, though,
7  that 3ABN is relying upon as for the valuation?
8      A.  22 million 900.
9      Q.  And what about this other appraisal that we
10 just learned about?
11     A.  First one came in at 10 -- almost
12 12 million, the first one, and that's why we had a second
13 one done, because David was bound and determined to sell
14 the property for 30 million, and to have an appraisal at
15 10 million or 12 million, I mean, it just seemed way out
16 of whack, so we hired another.  Paul Lowe did this, and
17 he came back at 22-9.
18     Q.  Who performed the first appraisal?
19     A.  I don't remember.  I don't remember.
20         MS. ZELMER:  Okay.  I imagine that'll be
21 produced to us?
22     A.  Yeah.
23         MR. SCHUPP:  It will.
24     Q.  (By Ms. Zelmer)  Okay.  Do you sitting here
25 today dispute the fact that the property is worth 22-9,

Page 224

1  22,900,000?
2          MR. SCHUPP:  At what time?
3      Q.  As of September -- or as of November 15th,
4  2012.
5      A.  Dispute?
6      Q.  Yeah.  Or do you agree with their -- the
7  valuation on the appraisal that's dated November 15th,
8  2012?
9      A.  I would.  I don't know if there's been much
10 change over there since this was done, and I was there
11 with the appraiser.  I actually walked the property
12 lines, and so I would agree at this point from the
13 knowledge that I have.  I'm not an appraiser, but it
14 seems reasonable.
15     Q.  And the appraisal was performed because it
16 needs to be done within, what, 60 days after the
17 transfer; is that correct?
18     A.  We had to know the value of the property
19 going into the trust for IRS reasons.
20     Q.  And that $22,900,000 has been reported to
21 the IRS; is that correct?
22     A.  Right.  That's what's on our books and
23 that's what's been reported.
24     Q.  Has that appraisal ever been updated?
25     A.  No.  It's still at 22-9.



Page 225

1  Q. Do you know if --
2  A. And I'm using that based on what I've been
3  told. I haven't seen the numbers, but I've been told
4  that it's 22-9.
5  Q. Okay. So the valuation, it could have gone
6  up or down, though, since 2012, correct?
7  A. Right.
8  Q. Do you know why an updated appraisal hasn't
9  been performed?
10  A. No. I don't know if it's necessary. I'd
11  have to check and see.
12  Q. And then you said that a survey was
13  performed and you paid $65,000 for a survey?
14  A. That's a number that's stuck in my head. I
15  haven't seen that number for a while, but the surveyor
16  spent more time than just surveying. He did all the
17  title search and he was the one that decided where the
18  boundaries were, which matched -- which matched the
19  boundaries on the map that we had.
20  Q. Yeah, I was going to ask you, why was it
21  $65,000?
22  A. Yeah, he spent a lot of time, and 65,000,
23  you know, I could be off on that, but that kind of rings
24  a bell.
25  Q. Did you ever get any quotes for a different

Page 226

1  surveyor?
2  A. I don't remember, and I'm trying to think --
3  I think Denise Lewis-Johnson was the one that
4  recommended, and everybody I've talked to speaks very
5  highly of Emile Ledee. He's well known in the Bahamas.
6  Q. Did 3ABN retain Emile Ledee or did Denise
7  Lewis-Johnson retain Emile Ledee?
8  A. I don't remember.
9  Q. Was there ever any title insurance obtained
10  on the property?
11  A. No. With all of the misunderstanding over
12  property boundaries, it was recommended from Emile, and I
13  said, "If you're really concerned about it, buy
14  insurance." About 225,000.
15  Q. $225,000?
16  A. And we just feel like we couldn't spend that
17  kind of money at this point.
18  MR. SCHUPP: Diane, if you want to know the
19  exact number of the survey, I have it.
20  MS. ZELMER: Sure.
21  MR. SCHUPP: $66,876.40.
22  THE WITNESS: I'm sorry. I was off 1,000.
23  MS. ZELMER: Where did you get that from?
24  MR. SCHUPP: A piece of paper in my file. I
25  got it from Brian Hamilton.

Page 227

1  MS. ZELMER: Okay.
2  Q. (By Ms. Zelmer) And then how much has 3ABN
3  spent on tax returns?
4  A. That I don't know.
5  Q. How much has 3ABN spent on taxes?
6  A. Don't know.
7  Q. Has 3ABN been paying property taxes?
8  A. I don't think so. I don't think there's --
9  I don't know. That's -- Again, that's not my area.
10  Q. Okay.
11  A. I wouldn't have the foggiest idea on that.
12  Q. I know you talked to Mr. Adderley about a --
13  bypassing capital gains tax on the sale of the property.
14  Did you ever talk to Mr. Adderley about a charitable tax
15  deduction?
16  A. No.
17  Q. Even when you were talking to him about the
18  proposal and you had the proposal prepared?
19  A. No.
20  Q. No? Okay. When you had spoken with Benton
21  and you e-mailed him, you asked him to prepare a
22  proposal, do you remember that?
23  A. Yes.
24  Q. Were you asking him to prepare a charitable
25  remainder unitrust?

Page 228

1  A. Yes.
2  Q. Okay. So you made the decision that you
3  thought the charitable remainder unitrust was the right
4  vehicle?
5  A. Well, this is something he and I had
6  discussed. I mean, it wasn't all of a sudden, "Hey, do a
7  charitable remainder unitrust."
8  MR. SCHUPP: You say he and I. Who's the
9  he, Adderley or Benton?
10  A. No, Benton. We're talking Benton, right?
11  Q. Uh-huh. Uh-huh.
12  A. So on that e-mail, that wasn't the first
13  time that a unitrust had been talked about.
14  Q. So who made the decision that the charitable
15  remainder unitrust was the proper vehicle?
16  A. Ultimately it would be Benton. We talked
17  about it and we told him what we had, and he's -- Barry
18  is a tax person. That's one of his specialties, is
19  taxes, so he understands -- everything that you've asked
20  me about, he would probably give you an answer right off.
21  Q. You have in your notes on Exhibit 25 that --
22  on that number 5 you list Adderley's housekeeper.
23  A. Yeah.
24  Q. Why is she listed?
25  A. She was there. She was there during the

